**United States District Court**
For the Northern District of California

**E-FILED on** 1/12/10

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| THE CENTRAL INSTITUTE FOR EXPERIMENTAL ANIMALS, a Japanese corporation,<br><br>Plaintiff,<br><br>v.<br><br>THE JACKSON LABORATORY, a Maine corporation,<br><br>Defendant. | No. C-08-05568 RMW<br><br>ORDER GRANTING CIEA'S MOTION TO DISMISS DEFENDANT'S COUNTERCLAIM OF PATENT INFRINGEMENT FOR LACK OF STANDING<br><br>**[Re: Docket No. 72, 81]** |

On December 12, 2008, plaintiff, the Central Institute for Experimental Animals ("CIEA"), filed a complaint against defendant, the Jackson Laboratory ("Jackson"), alleging patent and trademark infringement and unfair competition. On February 11, 2009, Jackson filed an answer and brought counterclaims, including a counterclaim for infringement of U.S. Patent No. 5,912,173 ("'173 Patent"). CIEA now moves for dismissal of Jackson's counterclaim for patent infringement based on lack of standing. For the reasons set forth below, the court grants the motion.

## I. BACKGROUND

Jackson Laboratory is an independent nonprofit research institution and the world's largest repository of research mice. CIEA is a non-profit Japanese corporation that develops animal models

used for scientific research. CIEA's scientists developed a severely immunodeficient mouse named the "NOG mouse," which is useful as a research tool. Jackson's counterclaim alleges that CIEA's NOG mouse infringes the '173 Patent. The '173 Patent is directed to the isolation, sequencing, and mutation of a particular mouse gene and is owned by the United States. According to Jackson, the NOG mouse includes the genetic mutation covered by the '173 Patent.

Because one of Jackson's mice, known as the "NSG mouse," also contains the genetic mutation covered by the '173 Patent, Jackson entered into a license agreement relating to the '173 Patent with the United States Public Health Service ("PHS") in 2005. This agreement states that Jackson has an "exclusive license" to sublicense, make, use, and sell certain "Materials," which is defined as a specific mouse strain developed by Jackson. Ex. 1 to the Decl. of Ronald M. Daignault, PHS Inter-Institutional Agreement ("Agreement") ¶¶ 2.1, 3.1. In addition, the agreement grants Jackson a "non-exclusive right to sublicense Patent Rights in conjunction with licenses it may grant to the Materials." *Id.* at ¶ 3.2. "Patent Rights" is defined as the '173 Patent. *Id.* at ¶ 2.2. In January 2009, Jackson and the PHS amended their licensing agreement, providing Jackson with the right to sue CIEA for infringement of the "Licensed Patent Rights" and to "settle any claim or suit for infringement of the Licensed Patent Rights including any and all sub-licensing of the Licensed Patent Rights." Ex. 2 to the Decl. of Ronald M. Daignault, Second Amendment to L-191-2005/0 ("Amendment") ¶ 4(a).

## II. ANALYSIS

### A. Legal Standard for Standing Under 35 U.S.C. § 207

"The doctrine of standing . . . has both constitutional and prudential components." *Evident Corp. v. Church & Dwight Co., Inc.*, 399 F.3d 1310, 1313 (Fed. Cir. 2005). Under Article III of the Constitution, the constitutional component of standing requires the following elements: (1) the plaintiff has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). In most patent infringement suits, plaintiffs that lack exclusionary rights fail to meet the injury in fact requirement because they suffer no legal injury when a party makes, uses, or sells the patented invention. *Morrow v. Microsoft Corp.*, 499 F.3d 1332,

1340-41 (Fed. Cir. 2007). In addition, the prudential component of standing in a patent infringement case generally requires that a patent owner be joined in any infringement suit brought by a licensee having fewer than all substantial rights in the patent. *Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc.*, 248 F.3d 1333, 1347-48 (Fed. Cir. 2001).

However, 35 U.S.C. § 207 changes the standing requirements for government-owned patents. This statute authorizes federal agencies to:

> *grant nonexclusive, exclusive, or partially exclusive licenses* under federally owned inventions, royalty-free or for royalties or other consideration, and on such terms and conditions, *including the grant to the licensee of the right of enforcement* pursuant to the provisions of chapter 29 of this title as determined appropriate in the public interest.

35 U.S.C. § 207(a)(2) (emphasis added). In *Nutrition 21 v. United States*, 930 F.2d 862 (Fed. Cir. 1991), the Federal Circuit closely examined the statutory language of 35 U.S.C. § 207, as well as its legislative history and the public policy concerns underlying passage of this legislation. The Federal Circuit concluded that when a patent is owned by the United States government, and the government has authorized the licensee to sue for patent infringement in its own name and on its own behalf, the licensee may bring suit without joining the United States as a party. *Id.* at 867. *Nutrition 21* made clear that the prudential standing requirement of joining the patentee is no longer required for government-owned patents when the government grants the licensee the right to sue. The parties dispute whether *Nutrition 21* or 35 U.S.C. § 207 impact the constitutional standing requirement of exclusionary rights to show injury in fact.

### 1. Exclusionary Rights

CIEA argues that *Nutrition 21* merely addresses the prudential standing requirement of joinder and does not address the constitutional standing requirement of injury in fact. Jackson contends that the Federal Circuit considered both prudential and constitutional components of standing because a footnote in the *Nutrition 21* opinion states, "Our decision in this case does not require a determination that Nutrition 21 is an *exclusive* licensee as that phrase has been defined in the case law." 930 F.2d at 865 n.7 (emphasis in original). The court is hesitant to read too much into this footnote, especially when there is no explicit language regarding constitutional standing requirements, either in the footnote or

elsewhere in the opinion. It appears that the Federal Circuit was not directly faced with a dispute regarding the injury in fact requirement in *Nutrition 21*.

Nonetheless, even limiting *Nutrition 21*'s holding to prudential standing requirements, the court finds that 35 U.S.C. § 207 necessarily changes the standard for finding injury in fact when a government-owned patent is involved. 35 U.S.C. § 207 authorizes the grant of enforcement rights to nonexclusive, exclusive, or partially exclusive licensees. *See Nutrition 21*, 930 F.2d at 865 n.7. *Nutrition 21* makes clear that this statute changed the prudential standing requirement for government-owned patents. With respect to nonexclusive licensees, it would be pointless for the statute to change only the prudential standing requirement of joinder and not the constitutional standing requirement of injury in fact. After all, so long as exclusionary rights are required to show injury in fact, nonexclusive licensees would fail to satisfy Article III's requirements for standing. If the language in the statute including non-exclusive licenses is to have any meaning, the statute must be read as providing nonexclusive licensees with an avenue for satisfying both prudential and constitutional standing requirements. Consequently, the court finds that licensees of government-owned patents need not establish exclusionary rights over the alleged infringing conduct in order to show injury in fact.

Though such licensees must still establish that they have suffered an injury in fact in order to meet Article III's standing requirements, this can be met by a showing of harm, such as economic injury, resulting from the alleged infringing conduct. Indeed, courts have recognized that nonexclusive licensees can suffer harm from infringement. *See, e.g., Ortho Pharm. Corp. v. Genetics Inst.*, 52 F.3d 1026, 1031 (Fed. Cir. 1995) (quoting *A.L. Smith Iron Co. v. Dickson*, 141 F.2d 3, 6 (2nd Cir. 1944)) ("It is indeed true that a mere licensee may have an interest at stake in such a [patent infringement] suit. . . . The reason why he is not permitted to sue is not because he has nothing to protect."). While there are policy reasons for limiting standing to exclusive licensees in most patent infringement cases, Congress saw fit to expand the pool of parties with standing to sue for infringement of government-owned patents with its enactment of 35 U.S.C. § 207. The public policy concerns underlying passage of 35 U.S.C. § 207 are set forth in 35 U.S.C. § 200, which states in part: "It is the policy and objective of the Congress . . . to minimize the costs of administering policies in this area [involving government-owned patents]." In considering whether 35 U.S.C. § 207 permits licensees to bring suit without joining the United States,

the Federal Circuit looked to the stated goal of cost-minimization. *Nutrition 21*, 930 F.2d at 866. Likewise, the court finds that the policy of cost-minimization is served by allowing non-exclusive licensees to enforce patent rights when granted such enforcement rights by the United States.

### 2. Nexus Between Licensed Rights and Infringing Conduct

Although licensees of government-owned patents need not have exclusionary rights over the alleged infringing conduct, they must still establish a nexus between their licensed patent rights and the alleged infringing conduct in order to bring suit. Otherwise, to pose an extreme example, a licensee of government-owned Patent A could sue for infringement of government-owned Patent B, so long as the government grants it such a right to sue. The Supreme Court and the Federal Circuit have made clear that "[a] patentee may not give a right to sue to a party who has no proprietary interest in the patent." *Ortho*, 52 F.3d at 1034 (citing *Crown Die & Tool Co. v. Nye Tool & Machine Works*, 261 U.S. 24, 44 (1923)). Nothing in the language, legislative history, or purpose of 35 U.S.C. § 207 suggests that this rule has been abolished. To the contrary, 35 U.S.C. § 207 states that it permits federal agencies to "grant non-exclusive, exclusive, or partially exclusive licenses . . . including the grant *to the licensee* of the right of enforcement." 35 U.S.C. § 207(a)(2) (emphasis added). Rather than permitting federal agencies to grant patent enforcement rights to any party, regardless of the relationship (or lack thereof) between the party and the patent, the statute limits the grant of enforcement rights to the licensee. Because there is no nexus between a license for rights to Patent A and the infringement of Patent B, a licensee of Patent A lacks standing to sue for infringement of Patent B. For the same reason, a party whose license is limited to a specific field of use does not have standing to sue if the alleged infringing conduct is outside its licensed field of use.

In conclusion, injury in fact does not require exclusionary rights and can be satisfied by economic injury if: (1) the license is for a government-owned patent, (2) the government has granted the licensee the right of enforcement, and (3) the alleged infringing conduct is **within the field of use** for which the licensee has been granted patent rights, whether they be non-exclusive, exclusive, or partially exclusive.

**B.     Jackson's License**

Jackson's patent infringement counterclaim concerns the '173 Patent. The '173 Patent is directed to the isolation, sequencing, and mutation of a particular mouse gene. According to Jackson, CIEA's NOG mouse infringes the '173 Patent because it includes the genetic mutation covered by the '173 Patent.

To meet Article III's standing requirements, Jackson must establish that it has suffered an injury in fact, that there is a causal connection between the injury and the conduct complained of, and that the injury will likely be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61. In this case, there is no dispute regarding the causation and redressability requirements. The only dispute is whether the injury in fact requirement has been met. Jackson asserts that it has suffered economic injury from the alleged infringement and should be compensated for lost profits. For such economic injury to satisfy Article III's injury in fact requirement, Jackson must show: (1) the '173 Patent is owned by the United States, (2) the United States has granted Jackson the right of enforcement, and (3) the NOG mouse is within the field of use for which Jackson has licensed patent rights. *Ortho*, 52 F.3d at 1032-33 (reciting the well-established rule that the party seeking to invoke the court's jurisdiction has the burden of demonstrating standing).

As for the first prong of this test, it is undisputed that the United States owns the '173 Patent.

### 1.     Right of Enforcement

Jackson's rights with respect to the '173 Patent arise from its 2005 license agreement with the PHS and their January 2009 amendment to that license agreement. The 2009 amendment to the license agreement states:

> Licensee shall have the right to: a) bring suit or counterclaim in its own name, at its own expense, and on its own behalf without the need for the PHS or appropriate Government authorities to join in such suit or counterclaim, for infringement by The Central Institute for Experimental Animals . . . of the Licensed Patent Rights; b) in any such suit or counterclaim, enjoin infringement and collect for its use, damages, profits, and awards of whatever nature recoverable for such infringement; and c) settle any claim or suit for infringement of the Licensed Patent Rights including any and all sub-licensing of the Licensed Patent Rights.

Amendment ¶ 4(a). This language is very similar to the language that the Federal Circuit considered in *Nutrition 21*, where it found that the licensee had been granted the right to enforce the licensed patent.

*Nutrition 21*, 930 F.2d at 864-65. Though this license agreement only allows Jackson to bring suit or counterclaim against CIEA rather than providing a more general right of enforcement, the court finds no reason to view this difference as significant. The intent of the license agreement is clear – to allow Jackson to bring a claim of patent infringement against CIEA. Thus, the court finds that the United States has granted Jackson the right of enforcement with respect to CIEA.

### 2.  Licensed Field of Use

Jackson must also show that CIEA's NOG mouse is within the field of use for which Jackson has licensed patent rights. The 2005 license agreement grants Jackson an "exclusive license" to sublicense, make, use, and sell certain "Materials" and a "non-exclusive right to sublicense Patent Rights *in conjunction with licenses it may grant to the Materials*." Agreement ¶¶ 3.1, 3.2 (emphasis added). "Materials" is defined as a particular mouse strain developed by Jackson, and "Patent Rights" is defined as the '173 Patent. *Id.* at ¶¶ 2.1, 2.2. Because Materials is limited to mice developed by Jackson, CIEA's NOG mouse is outside the scope of the exclusive license. Since the right to sublicense Patent Rights is limited to sublicensing in conjunction with the granting of Materials licenses, CIEA's NOG mouse is also outside the scope of this non-exclusive license. In fact, it is undisputed that CIEA's NOG mouse is outside the scope of any license granted by the original 2005 agreement. *See* Ex. 1 to Decl. or Richard Eskew.

In January 2009, Jackson and the PHS amended their licensing agreement, providing Jackson with the right to sue CIEA for infringement of the "Licensed Patent Rights" and to "settle any claim or suit for infringement of the Licensed Patent Rights *including any and all sub-licensing of the Licensed Patent Rights*." Amendment ¶ 4(a) (emphasis added). Jackson points to this language as evidence that Jackson has a license covering the NOG mouse. According to Jackson, this language shows that Jackson has the right to sublicense the NOG mouse, which means it must itself have a license covering the NOG mouse because "an owner or licensee of a patent cannot convey that which it does not possess." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1382 (Fed. Cir. 2000). Jackson is correct that if it has the right to sublicense the NOG mouse, it must also have a license covering the NOG mouse. However, the January 2009 amendment falls short of conveying to Jackson a right to sublicense the NOG mouse.

The amendment refers to Jackson's sublicensing of the "Licensed Patent Rights." Though the term "Licensed Patent Rights" is not separately defined, "Licensee" is defined as Jackson Laboratory and "Patent Rights" is defined as the '173 Patent. Agreement ¶ 2.2; Amendment. Accordingly, the plain meaning of "Licensed Patent Rights" is those rights to the '173 Patent that have been licensed to Jackson Laboratory. As discussed previously, Jackson's rights to the '173 Patent are limited to the exclusive right to sublicense, make, use, and sell Materials and the non-exclusive right to sublicense Patent Rights in conjunction with the granting of Materials licenses. Agreement ¶¶ 3.1, 3.2. Because Materials is limited to mice derived by Jackson, Agreement ¶ 2.1; Amendment ¶ 1, Jackson can only sublicense Patent Rights in conjunction with licensing mice derived by Jackson. Consequently, the January 2009 amendment's reference to "any and all sub-licensing of Licensed Patent Rights" refers only to Jackson's limited right to sublicense the '173 Patent when granting a license for mice derived by Jackson. The amendment does not provide Jackson with a right to sub-license the '173 Patent for mice that are not derived by Jackson, such as the NOG mouse.

Because the NOG mouse is outside the scope of Jackson's licensed patent rights, Jackson does not have standing to bring a patent infringement suit against CIEA. Accordingly, the court dismisses Jackson's patent infringement counterclaim for lack of standing.

### C. Dismissal without Prejudice

"[T]he law universally disfavors dismissing an action with prejudice based on lack of standing, and there is a strong presumption that such a dismissal is improper." *Univ. of Pittsburgh v. Varian Medical Sys., Inc.*, 569 F.3d 1328, 1333 (Fed. Cir. 2009). The Federal Circuit has only affirmed a dismissal with prejudice based on lack of standing when either the plaintiff has already been given a chance to cure the defect and failed to do so, or it was extremely unlikely that the standing defect could be cured. *Id.* Jackson has not had a prior opportunity to cure the defect, and it is not clear that it cannot do so. Therefore, dismissal with prejudice is not appropriate.

## III. ORDER

For the foregoing reasons, the court grants the motion to dismiss Jackson's counterclaim of patent infringement without prejudice.

DATED: 1/12/10

*Ronald M. Whyte*
RONALD M. WHYTE
United States District Judge

**Notice of this document has been electronically sent to:**

**Counsel for Plaintiff:**

Joseph Diamante        JDiamante@stroock.com
Kenneth E. Keller      kkeller@kksrr.com
Michael David Lisi     mlisi@kksrr.com
Ronald Marc Daignault  rdaignault@stroock.com

**Counsel for Defendant:**

Chelsea A Loughran     cloughran@wolfgreenfield.com
Howard Alan Slavitt    EfilingHAS@cpdb.com
Michael A. Albert      malbert@wolfgreenfield.com
Michael Rader          mrader@wolfgreenfield.com
Allison Lee Ehlert     ale@cpdb.com

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program.

**Dated:** 1/12/10                    CCL
                                      **Chambers of Judge Whyte**